276 So.2d 616

**William Leonard O'NEAL**

v.

**STATE.**

**5 Div. 73.**

Court of Criminal Appeals of Alabama.

Jan. 23, 1973.

Rehearing Denied Feb. 20, 1973.

Samford, Torbert, Denson & Horsley, Opelika, for appellant.

William J. Baxley, Atty. Gen. and David W. Clark, Asst. Atty. Gen., for the State.

DeCARLO, Judge.

William Leonard O'Neal was convicted of a violation of Title 14, § 174, Subsection (a), Code of Alabama 1940 Recompiled, 1958, which reads:

"No person who has been convicted in this State or elsewhere of committing or attempting to commit a crime of violence shall own a pistol or have one in his possession or under his control."

Upon this conviction, the Circuit Court of Lee County assessed the appellant's punishment at four years. It is from this judgment that he appeals.

The testimony showed the factual situation to be that Jasper Snipes, along with his brother, Jim Snipes, managed the Bam-

boo Club in Opelika, Lee County, Alabama, on the night of August 15, 1970, and that appellant worked for them checking hands. (As the patron entered and paid, his hand was stamped, and he was free to go and come without additional payment) It was appellant's job to make sure that all who entered the club had paid the "admission fee."

Shortly after midnight, Jasper Snipes was parking cars, and his brother was at the door with appellant.

As Jasper Snipes approached the club door, he saw Johnny Spratling with a pistol drawn on appellant. Although he did not see Spratling fire, he did hear a shot. Shortly after this, he saw appellant with a pistol. He recognized this weapon as being the one O'Neal had given Jim Snipes earlier in the evening to place under the counter.

The following morning, appellant put the pistol in a paper sack, and Jasper and Jim Snipes drove him to the police station where it was given to Detective Fred Davis.

Jim Snipes testified that Spratling tried to get into the club without paying and told O'Neal he could not keep him out. He pushed O'Neal, and when appellant pushed him, Spratling pulled a gun and shot. It was then the appellant took the pistol from behind the counter and shot Spratling in the leg.

Tazzer Nelms, who was shot during the exchange of gunfire, gave a conflicting account. He stated that appellant pushed Spratling out the door, and then drew a pistol from his right front pocket. He did not remember which one fired the first shot.

On Sunday, August 16, 1970, Detective Davis of the Opelika Police Department, saw Jim and Jasper Snipes, along with the appellant, at the police station. At this time, Jasper Snipes gave the pistol to the detective, and appellant stated it belonged to the club.

Detective Davis testified that the foregoing was the first of three occasions on which appellant made a statement regarding the pistol. On August 21, 1970, at appellant's home, in the presence of his wife, Detective Davis, Sgt. Abbott, and a federal firearms agent, Jim Harter, and after being advised of his constitutional rights, appellant stated that he had given the pistol to George Avery, prior to leaving for the club on August 15. Upon arrival at the club, the pistol was returned to appellant, and he placed it under the counter. O'Neal stated the gun was his, and he had bought it in March from a truck driver. At the time this statement was made, appellant was advised of the possibility that he could be prosecuted for illegal possession of a pistol.

This second statement was handwritten and signed by appellant. O'Neal testified that when Jim Harter returned the typewritten statement for his signature, the agent promised if the statement was signed, appellant would never have to go to court, and further, if O'Neal helped him catch bootleggers, the statement would never be used against him. On cross-examination, Detective Davis stated he was not present when the third statement was signed, but that no promise was made or offered in his presence for the statements given on August 16 and August 21, 1970.

I

Appellant first contends that all of his statements were involuntary and should not have been admitted into evidence.

■ Where the proper predicates are laid and ample evidence is presented, the trial judge can make a determination of voluntariness. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Brown v. State, 45 Ala.App. 265, 229 So.2d 40; Middleton v. State, 47 Ala.App. 130, 251 So.2d 627.

Each of appellant's statements was before the trial court on voir dire, outside the presence of the jury, and the following

is from the testimony of Detective Davis on direct examination:

"THE COURT: Let the jury go out, please. Will you all go back in that room in there.

(Thereupon the jury retired from the courtroom and the following proceedings were had out of the presence and hearing of the jury)

"Q. I believe before the jury went out I asked you did the defendant make a statement to you and Agent Harter. Who was present at the time he made this statement to the two of you all?

"A. William O'Neal and myself and Jim Harter and—

"Q. Was that all?

"Q. There was one other, but I forgot which one of the detectives was with us. I believe it was Sergeant Abbott.

"Q. Sergeant Abbott of the Opelika Police Department?

"A. I think so, yes, sir.

"Q. All right. Prior to him making any statement to you all on that day, state whether or not he was advised of all of his constitutional rights.

"A. He was.

"Q. What rights were he advised of on that occasion?

"A. Told him that before we could ask him any questions it was our duty to advise him of his rights. That he had the right to remain silent; that anything he said may and could be used against him in a court or other proceedings; also had the right to have an attorney for advice or have him present during questioning; if he could not afford a lawyer, one would be appointed for him by the court; and

if he decided to waive these rights and to talk to us about this, that he still also had the right to stop questioning at any time to consult a lawyer or have him present at that time during the further questioning.

"Q. After advising him of his rights, did he still make a statement?

"A. He did.

"Q. Prior to him making this statement, state whether or not anyone in his sight, presence, or hearing made any threats towards him or offered him any reward or hope of reward or any other inducement towards him to get him to make a statement.

"A. Did not.

"THE COURT: Let me ask you one question. Did you ask him also, after you explained these rights, whether or not he understood them?

"A. Yes, sir."

\*    \*    \*    \*    \*    \*

On Voir Dire Examination by Mr. Denson, Attorney for Appellant:

"Q. State whether or not Mr. Harter told William O'Neal that if he would make a statement and sign it, that it would in no way be used against him and it would not give him any trouble.

"A. Don't remember that, Mr. Denson, no, sir.

\*    \*    \*    \*    \*    \*

"THE COURT: Did you ever question him without advising him of his constitutional rights?

"A. No sir.

"MR. DENSON: That's all.

"THE COURT: The Court holds that the statement is voluntary."

The appellant testified on voir dire out of the presence of the jury and denied the statement was voluntary and contended he was promised immunity, and the statement would not be used against him.

■ After the voir dire examination out of the presence of the jury, the trial court concluded that the proper predicates were laid, and the statement was voluntary. Detective Davis was permitted to testify as to what he heard the appellant say, but the court did not allow introduction of either the handwritten or the typewritten statement.

It is our opinion that the record indicates the officers involved in this case did safeguard the constitutional rights of this appellant, and in no way infringed upon them. The trial court had ample testimony upon which to make this determination, and this it did without error.

II

■ Where evidence of a prior conviction of a crime of violence is introduced, proof that defendant subsequently owned a pistol or had one in his possession or under his control will justify a conviction under Title 14, § 174, Subsection (a), Code of Alabama 1940, Recompiled 1958. Proof of a conviction may come from the State's introduction of the original court record or by the defendant's own admission.

In the case before us, the Circuit Clerk of Lee County, presented docket sheets from his Court, showing a conviction of second degree burglary and a conviction of grand larceny. Of the two convictions proved, one was admitted by appellant, and the other denied.

It is appellant's contention that under the above statute, it was prejudicial to the appellant to allow the introduction of more than one criminal charge when all that was

necessary for his conviction was the admission into evidence of one charge of a crime of violence.

■■ The general rule in Alabama is that evidence of distinct and independent offenses are not admissible in the trial of an unrelated offense. Mason v. State, 259 Ala. 438, 66 So.2d 557. One of the exceptions to this rule, however, is where the evidence is relevant to the offense being tried. Another exists where the offenses are relevant to show purpose, or to prove one or more of the essential facts laid in the indictment. 22A C.J.S. Criminal Law § 691(40).

While the statute clearly states that proof of one prior crime is sufficient for a conviction, it in no way restricts the number that may be proved.

For our determination of this question, we considered two cases prosecuted under the above statute. In Jackson v. State, 37 Ala.App. 335, 68 So.2d 850, the State introduced evidence of a larceny [1] conviction in Jefferson County, Alabama, and on cross-examination, the defendant testified to a conviction of burglary in Michigan. The opinion in Robinson v. State, 40 Ala.App. 101, 108 So.2d 188, sets out, "The charge of two prior convictions of manslaughter was admitted."

■ We hold the introduction of the two prior convictions in Lee County resulted in no harm to appellant, and the Court was not in error in allowing such proof.

III

Appellant contends that the details of the shooting were not part of the res gestae in a charge of illegal possession of a weapon.

"It is difficult, if not impossible, to accurately define the principle of *res gestae,* as it is often called. It is commonly said to have reference to such circumstances

---

1. Although this court bowed to the legislature's designation of larceny as a crime of violence, this writer has serious reservations concerning the correctness of that interpretation. Our thought on this point, however, in no way affects our decision in the instant case.

and declarations as are *contemporaneous* with the main fact under consideration, and so closely connected with it as to illustrate its character. 1 Greenl. Ev. § 108. What lapse of time is embraced in the word 'contemporaneous,' is often a question of difficulty. Perfect coincidence of time between the declaration and the main fact is not, of course, required. It is enough that the two are substantially contemporaneous; they need not be literally so. The declarations must, however, be so proximate in point of time as to grow out of, elucidate, and explain the character and quality of the main fact, and must be so closely connected with it as to virtually constitute but one entire transaction, and to receive support and credit from the principal act sought to be thus elucidated and explained. The evidence offered must not have the ear-marks of a device, or afterthought, nor be merely narrative of a transaction which is really and substantially past." Alabama Great Southern Railroad Company v. Hawk, 72 Ala. 112, 47 Am.Rep. 403.

"In determining whether evidence sought to be admitted as part of the res gestae is a part of the main event, each case must be determined on its own particular facts." Lang v. State, 40 Ala.App. 705, 122 So.2d 526.

We have before us a charge of illegal possession of a weapon after conviction of a felony, and any circumstance having to do with the main fact of ownership, possession or control of the weapon would be admissible as part of res gestae.

The number of times the pistol was fired, and at whom, are matters closely connected with, and which tend to illustrate the main fact of ownership, possession, and control of the weapon.

We have searched this record and finding no error, we affirm.

Affirmed.

CATES, P. J., and ALMON, TYSON and HARRIS, JJ., concur.